Edward O. Comitz, #015006
ecomitz@cobelaw.com
Patrick T. Stanley, #023835
pstanley@cobelaw.com
Karla B. Thompson, #029395
kthompson@cobelaw.com
**Comitz | Beethe**
Scottsdale Spectrum
6720 N. Scottsdale Road, Suite 150
Scottsdale, AZ 85253
Telephone 480.998.7800
Fax: 480.219.5599
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CINDY L. CURLIS, | No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| LIFE INSURANCE COMPANY OF NORTH AMERICA; CRICKET COMMUNICATIONS, INC. LONG-TERM DISABILITY PLAN; and CRICKET COMMUNICATIONS, LLC, fka CRICKET COMMUNICATIONS, INC., as Administrator of the CRICKET COMMUNICATIONS, INC. LONG-TERM DISABILITY PLAN, | |
| Defendants. | |

Plaintiff, Cindy L. Curlis, by and through her undersigned counsel, brings this action against Defendants Life Insurance Company of North America, Cricket Communications, Inc. Long-Term Disability Plan, and Cricket Communications, LLC, fka Cricket Communications, Inc., as Administrator of the Cricket Communications, Inc. Long-Term Disability Plan, and states as follows:

## INTRODUCTION

1.      This is an action for judicial reinstatement of wrongfully terminated long-term disability benefits pursuant to 29 U.S.C.A. § 1001 *et seq.*, the Employment Retirement and Income Security Act of 1974 ("ERISA").

2.     Plaintiff Cindy L. Curlis is entitled to long-term disability benefits and protections under ERISA due to her membership in the long-term disability insurance program, established by CIGNA Group Insurance and underwritten by the Life Insurance Company of North America ("CIGNA"), while employed as a District Director at Cricket Communications, Inc.

3.     On September 26, 2011, CIGNA approved Ms. Curlis for long-term disability benefits. On December 11, 2013, CIGNA terminated all benefits. CIGNA has arbitrarily and capriciously refused to reinstate Ms. Curlis's benefits. Ms. Curlis has appealed this benefit determination and as such, has satisfied any obligation to exhaust her administrative remedies before petitioning this Court for relief. Pursuant to her rights under ERISA, Ms. Curlis now requests judicial review of CIGNA's decision to terminate her benefits.

4.     The allegations herein are based upon Ms. Curlis's knowledge and experience, as well as the documentation contained in the administrative file maintained by CIGNA throughout this dispute.

## PARTIES, JURISDICTION AND VENUE

5.     Ms. Curlis is a natural person domiciled within the State of Arizona.

6.     According to the applicable summary plan description, CIGNA is the company that provides benefits under the Cricket Communications Long-Term Disability Group Policy via Policy No. LK-960841 (the "Policy").

7.     CIGNA also serves as the administrator of claims made under the Policy, including Ms. Curlis's claim.

8.     CIGNA is a foreign corporation engaged in the business of insurance and insurance claim administration, with its principal place of business in the State of Connecticut.

9.     The benefit plan is sponsored and administered by Cricket Communications, LLC (formerly known as Cricket Communications, Inc.), a company engaged in providing telecommunications services, whose principal place of business is located in the State of

Delaware.

10.     The defendant plan constitutes an employee welfare benefit plan as defined by ERISA at 29 U.S.C.A. § 1002(1)(A).

11.     This action is brought to recover benefits due to Ms. Curlis under the terms of the Policy. Accordingly, this Court's jurisdiction is invoked pursuant to 29 U.S.C.A. § 1132(a)(1)(B) and 29 U.S.C.A. § 1132(f).

12.     Venue is proper pursuant to 29 U.S.C.A. § 1132(e)(2) because the Policy is administered within this district, the breach occurred within this district, and Defendants may be found within this district.

## FACTUAL ALLEGATIONS

### I.     Ms. Curlis's Education, Training and Experience

13.     Prior to September 2009, Ms. Curlis was a successful District Director for Cricket Communications.

14.     Ms. Curlis worked in the telecommunications industry, in one capacity or another, since 1996.

15.     She began as an account executive, but quickly worked her way up to progressively more senior positions until 2001, when she was hired as the District Director for Cricket Communications ("Cricket").

16.     Ms. Curlis had only a high school degree, but she was able to attain this position due to her concentrated training and experience in the telecommunications industry.

17.     As District Director, Ms. Curlis was in charge of distributor relations and sales for the entire Phoenix metropolitan area.  This was not an ordinary desk job; it was both physically and mentally demanding and extremely high pressure.

18.     A major responsibility of her position was to develop and maintain business in the Phoenix area.  She was expected to generate 80% of sales through outside distributors and retail outlets, as opposed to the 20% expected to be generated through Cricket-owned retail stores.

19.     In order to meet these high sales goals, Ms. Curlis was required to continually identify potential retail outlets who would be willing to sell Cricket products at their locations, contact their owners personally to promote Cricket products, and establish and maintain ongoing business relationships.  In addition, Ms. Curlis managed a team of fourteen to sixteen employees.

20.     Ms. Curlis's job duties as District Director required her to, among other things:

a.     Work long, unpredictable hours, frequently totaling more than 60 hours per week, occasionally up to 80 hours per week;

b.     Research potential retail outlets willing to sell Cricket products;

c.     Personally contact business owners and persuade them to meet with her to discuss Cricket's offerings;

d.     Travel by car throughout the Phoenix metropolitan area;

e.     Visit with managers and owners in person to pitch the advantages of serving as an authorized dealer of Cricket products;

f.     Maintain a personable, friendly, and professional demeanor in face-to-face meetings with potential dealers;

g.     Remember and articulate detailed functional aspects of Cricket's products;

h.     Persuade potential dealers of the financial benefits of selling Cricket's products;

i.     Negotiate the terms and conditions of dealer agreements;

j.     Be on call to provide ongoing support to retail stores whenever needed; including daytime, evenings, weekends, and holidays;

k.     Monitor sales figures for each authorized dealer;

l.     Analyze projected versus actual sales for each authorized dealer;

m.     Monitor inventory levels for each authorized dealer;

n.     Determine appropriate inventory levels at each authorized dealer based on an analysis of projected versus actual sales;

4

o.   Manage a team of fourteen to sixteen individuals, including six to eight account managers, six service specialists, and two coordinators;

p.   Monitor employee conduct and performance to ensure corporate standards are met;

q.   Meet with employees individually to address account-related questions and resolve employment issues;

r.   Determine account management needs of authorized dealers;

s.   Coordinate with account managers to ensure dealers' account management needs are met and outstanding tasks are properly distributed amongst account managers;

t.   Compile overall sales data across all accounts;

u.   Draft reports of sales data;

v.   Analyze overall sales data across all accounts;

w.   Strategize methods for increasing sales and profits;

x.   Develop creative marketing strategies to grow sales;

y.   Sit upright for extended periods of time while working on a computer;

z.   Lift and carry large product displays, signs, and promotional accessories, frequently weighing 10 pounds or more and occasionally weighing 20 pounds or more;

aa.  Assemble, modify, and reposition product displays, signs, and promotional accessories, including bending, stooping, lifting, carrying, and climbing ladders.

21.   For the type of duties Ms. Curlis performed, mental acuity was just as important (and at times, more important) than her physical capabilities.

22.   Although Ms. Curlis's job was stressful and she carried a great deal of responsibility, she enjoyed her work and performed it well.

5

23.     Ms. Curlis consistently met sales and distribution goals, and was rewarded accordingly.  In fact, by the time she became permanently and totally disabled in September 2009, she earned an annual income of approximately $120,477.12.

**II.     Ms. Curlis's Medical Condition**

24.     Prior to 2002, Ms. Curlis not only worked full time, but also lived an active lifestyle.  She enjoyed hobbies such as weightlifting, hiking, and competitive walking.

25.     In the middle of 2002, however, Ms. Curlis began experiencing constant soreness in her lower back.

26.     Although she initially thought she had simply strained a muscle and the soreness was only temporary, the pain continued to progress.

27.     In July 2002, Ms. Curlis visited an orthopedic surgeon, Dr. James Maxwell, regarding her symptoms.

28.     By that time, her pain had spread and she was experiencing a constant stabbing sensation in her left leg.

29.     When her pain and soreness were not relieved by simple treatments like over-the-counter analgesics, cold and hot therapies, or massages, Ms. Curlis underwent an MRI of her lumbar spine.

30.     The MRI revealed that Ms. Curlis suffered from disc desiccation at the L4-L5 level.

31.     Ms. Curlis's doctors prescribed a series of epidural injections and facet blocks, which were unsuccessful in resolving her symptoms.

32.     Recognizing that ongoing treatment with serious medications would be ineffective at resolving Ms. Curlis's pain, Dr. Maxwell recommended that Ms. Curlis undergo a procedure to replace her vertebral disc at the L4-L5 level with a Chartié Artificial Disc.

33.     Although the procedure was still in the trial phase of development at the time, Ms. Curlis agreed to the surgery, believing that there were no other options.  The surgery

was performed on February 26, 2003.

34.     Ms. Curlis's pain did not resolve completely, but all signs initially indicated that the procedure was successful.  In fact, Ms. Curlis's pain was significantly decreased compared to her pre-surgery condition.

35.     Nonetheless, Ms. Curlis continued to experience constant soreness and often awoke at night due to muscle stiffness.

36.     Fortunately, a combination of physical therapy and pain mediation allowed her to continue working full time, and enabled her to resume many aspects of her formerly active lifestyle.  Ms. Curlis coped with her ongoing, but manageable, pain for several years.

37.     In the second half of 2009, Ms. Curlis's condition took a sudden and dramatic turn for the worse.  This began with a sharp increase in the level of her pain.

38.     In order to continue working, she adjusted her lifestyle as best as possible.  She stopped exercising, was careful and deliberate with every movement involving her back, and took pain medication as necessary.

39.     Although she began experiencing urinary retention – the sensation of needing to urinate without being able to – she did not realize it could be a sign of serious nerve damage.

40.     Ms. Curlis hoped that with rest, her symptoms would resolve.

41.     Unfortunately, though, her symptoms progressed.

42.     In September 2009, as she performed her usual routine of household chores before heading off to work, Ms. Curlis bent over to place a bowl of dog food on the ground, and felt a sharp and sudden "pop" in her spine.

43.     Immediately, she felt an excruciating stabbing and burning sensation explode down her lumbar region and into her legs.  Her back muscles contracted violently, and she collapsed to the ground, hardly able to move.

44.     Ms. Curlis immediately scheduled an appointment with her primary care physician, Dr. Ann Tendler.  Dr. Tendler was concerned about the possibility of spinal cord

compression and, after a physical examination, immediately sent Ms. Curlis to the emergency room.

45. At first, Dr. Tendler was not exactly sure what was causing Ms. Curlis's symptoms, and even suspected a heart condition, because Ms. Curlis also experienced chest pain during this incident.

46. Dr. Tendler ordered testing for Ms. Curlis' heart and referred her to Dr. Azmi Nasser to manage her back pain with medication.

47. Dr. Nasser implemented a pain management protocol of strong narcotic pain medications that cause significant cognitive impairments.

48. Although the chest pain subsided, an MRI of Ms. Curlis's spine on September 17, 2009, revealed that her back pain was due to the fact that the artificial disc in her back failed, causing significant damage to the surrounding tissue, resulting in multi-level facet arthropathy, and foraminal stenosis.

49. Ms. Curlis's doctors also performed a CT scan on her lumbar spine on September 29, 2009. This test further confirmed the advanced degenerative facet changes along her spine, but the full extent of the damage to Ms. Curlis's spine was not visible on the MRI or the CT because the metal in the artificial disc obstructed the view of the surrounding tissue.

50. Nonetheless, Ms. Curlis's doctors understood that her symptoms were likely explained by the well-documented long-term potential consequences of artificial disc replacement surgery.

51. Ms. Curlis's doctors explained that it is not uncommon for patients to experience temporary benefits from surgery, followed by long-term failure.

52. The primary causes of long-term persistent pain following artificial disc replacement are degeneration at another level of the spine, movement of the prosthesis, and facet joint arthrosis.

53. Indeed, despite the fact that Ms. Curlis's lumbar spine was sub-optimally

visualized due to the artificial disc itself, Ms. Curlis's doctors could clearly see surgical changes at L4-5, with advanced facet degenerative changes from L3 through L5.

54.     This was confirmed when Ms. Curlis consulted with Dr. Jonathan Landsman on October 13, 2009.

55.     During this visit, Ms. Curlis described the severity of her lower back pain.  She also described pain, tingling, and numbness that radiated down her legs, all the way to her feet.

56.     Dr. Landsman performed a physical exam and noted that Ms. Curlis had difficulty extending her back because of her pain, and described her walking with a bent-forward gait.

57.     He also noted that she had pain to palpation across her lumbar spine and her lumbosacral junction.

58.     Dr. Landsman decided that, although Ms. Curlis was "hurting badly enough to warrant surgery," the first course of action would be to proceed conservatively, using facet injections as a method of pinpointing the exact source of pain to determine whether anything could be done.  Additionally, the artificial disc rendered any surgical remedy risky, at best, with uncertain outcomes and a substantial risk of paralysis or even death.

59.     Ms. Curlis underwent a facet injection on October 23, 2009.  Unfortunately, the injection was entirely unsuccessful at resolving, or even reducing, her pain.  Ms. Curlis met with Dr. Landsman again on December 8, 2009, who confirmed that Ms. Curlis was still unable to return to work.

60.     Desperate to find a treatment, and in order to receive a second opinion, Ms. Curlis met with Dr. Maxwell, the orthopedic surgeon who originally performed her surgery, on January 20, 2010.

61.     On physical examination, Dr. Maxwell described Ms. Curlis as sitting stiffly and awkwardly in order to minimize her pain.  He found that she had severely limited range of motion in her spine and marked percussive tenderness.  Dr. Maxwell found that Ms. Curlis

9

was in obvious acute distress due to her pain, and was urgently in need of treatment. He further concluded "[s]he is flatly unable to work because of this difficulty."

62. Dr. Maxwell ordered another MRI of her lumbar spine, which was performed on February 8, 2010. This MRI revealed anterolisthesis at the L4-L5 level, foraminal stenosis at the L5-S1 level, and bilateral facet degenerative disc disease from L3 through L5.

63. In order to determine whether and to what extent Ms. Curlis had suffered nerve damage, she underwent an EMG nerve conduction study on February 11, 2010, which confirmed chronic bilateral sciatic neuropathy.

64. On February 26, 2010, Ms. Curlis visited Dr. Louis Rappoport, another orthopedic surgeon in Phoenix, for a third opinion regarding surgery. Dr. Rappoport reviewed the imaging studies, the recent EMG study and examined Ms. Curlis.

65. Furthermore, based on the results of the EMG study, Dr. Rappoport opined that the numbness, tingling and pain that travel down Ms. Curlis's legs are likely due to nerve damage, as opposed to merely radiating pain from her back. He concluded that Ms. Curlis's nerve damage was likely permanent and not treatable, even with a posterior fusion surgery.

66. On March 18, 2010, Ms. Curlis underwent another CT scan of her lumbar spine.

67. This imaging study again showed post-operative disc changes at the L4-L5 level due to the artificial disc replacement, including bilateral facet arthropathy at the L4-L5 and L5-S1 levels.

68. Although Dr. Rappoport suggested potentially undergoing facet block injections, any therapeutic effects from facet block injections would only be temporary and would not resolve the underlying cause of her symptoms.

69. Furthermore, such injections are risky and painful because they involve injecting medication into the spinal joints and can cause further nerve damage or even paralysis.

70. Ms. Curlis herself experienced partial paralysis that lasted for several hours

10

following one such injection.

71.     Additionally, Ms. Curlis's doctors have decided that a spinal fusion is unlikely to resolve her symptoms and carries significant and unacceptably high risks, including paralysis and death.

72.     Aside from the risks associated with the actual surgical procedure, there is also a high probability that the procedure would not resolve her symptoms, or could actually make her condition worse.

73.     This is because Ms. Curlis would likely require fusion of multiple levels of her lumbar spine.  Unfortunately, as each level of the spine is fused, the natural motion in the spine is greatly impaired, and a great deal of stress is placed on the surrounding joints.

74.     This can lead to further degeneration of the spinal joints. Furthermore, as Dr. Rappoport noted, it is likely that the nerve damage that is causing pain, numbness, and tingling to radiate into Ms. Curlis's lower extremities is permanent and would not resolve even with posterior fusion.

**III.     Ms. Curlis's Physical Limitations**

75.     Today, Ms. Curlis spends most of her time lying down or reclining.

76.     Her pain begins in the middle of her lumbar spine as a constant aching feeling that has sharp stabbing, throbbing and burning components.  The pain radiates into her hips and down the back of both legs.

77.     She also has extreme and deep muscle tightness and knots throughout her back and into her buttocks and hamstrings.  She feels a constant tingling sensation down her legs, along with numbness that flows all the way down to her feet.

78.     Even basic movements that Ms. Curlis used to take for granted have become difficult to perform without the use of high doses of narcotic pain medication.

79.     Tasks like brushing her hair or washing her body are painful because it hurts to lift her arms, and any twisting of her back or pressure on her spine while standing or sitting is extremely painful as well.

80. Although most physical activity is painful, inevitably Ms. Curlis must occasionally move around, for example to use the bathroom, travel to her doctor's office, or sometimes to shop for necessities.

81. Simply getting out of bed, however, requires a long series of careful and deliberate movements: lying on her side, she pushes with her elbows, rolling her body onto her hands and knees; after resting a few seconds, she slowly crawls backwards until her feet dangle off the side of the bed; she gently places one foot on the ground; then the other; then she rests again; still leaning on the bed, she grasps her cane, and begins the slow and arduous trek out of her bedroom.

82. As she walks, she typically supports herself with her cane in her right hand, or leans on another person for balance.  If shopping, Ms. Curlis normally uses a shopping cart to carry her purchases and support her.

83. Unfortunately, her muscles have become so weak that she frequently stumbles, and sometimes she even unexpectedly collapses to the ground, especially when rising from a sitting position.  Her body is covered with bumps and bruises from these spills.

84. When sitting, she must often flex her body forward at a 45-degree angle to reduce the direct pressure on her lower spine and support the weight of her body with her arms or elbows, especially on days that she has breakthrough pain not alleviated by her medication.

85. Because of Ms. Curlis's condition, she is forced to rely on her son to perform many of her activities of daily living, like preparing meals, cleaning, doing laundry, washing dishes, shopping, or driving.  This is because anything more than extremely limited physical exertion causes pain that is too much to bear.

86. Unfortunately, caring for his mother has become a great burden on Ms. Curlis's son, emotionally, physically, and financially.  In addition, because he works full-time, Ms. Curlis is left home alone for most of the day.

87. Since CIGNA approved Ms. Curlis's claim in September 2011, her condition

has not improved.  In fact, her condition has deteriorated further.

88.     Dr. Nasser noted that Ms. Curlis had not improved in the three years since he began treating her.

89.     Ms. Curlis continues to carry herself in a flexed-forward posture.

90.     She now constantly feels a tingling sensation down her legs, along with numbness down to her feet.

91.     Due to the high levels of pain medication she is using, she is now experiencing serotonin syndrome episodes that occur several times per week, without warning.

92.     When a serotonin episode strikes, Ms. Curlis immediately starts to shake and sweat, and must lie down and be as still as possible until the episode passes, which can take several hours.

93.     Furthermore, as Dr. Nasser noted, and as her medical records reflect, Ms. Curlis has had ongoing issues with her GI tract because her narcotic pain medications slow her body's digestive system.

94.     For example, in February 2012, Ms. Curlis was hospitalized for five days due to a very painful and potentially life-threatening bowel obstruction.

95.     Even with strong anti-constipation medication, Ms. Curlis still has one or fewer bowel movements per week, and the process of having a bowel movement is intensely painful and prolonged, lasting an hour or more.

96.     Within the past year, Ms. Curlis has frequently lost her balance due to muscle atrophy in her legs and the nerve damage in her lower spine.

97.     If she sits for too long, she loses all sensation in her legs.

98.     Unfortunately, due to the high levels of pain medication she must take, she often cannot recognize the numbness until she tries to stand up and her legs unexpectedly collapse.

99.     As a result, in the last year, she has fractured her foot and her wrist in two major falls, in addition to multiple bumps and bruises from smaller falls.

100. Although most physical activity is painful, some days are better for Ms. Curlis than others.

101. Particularly when she was able to pay for Oxycontin and Fentanyl, Ms. Curlis would have days when she was able to go out and run light errands for a while.

102. However, her relatively good days are far outnumbered by days spent sitting in isolation within her house, suffering pain, tremors, weakness and fatigue.

103. Ms. Curlis's physical condition, coupled with the mentally debilitating effects of the medication her pain levels require, render her unable to work in any occupation, let alone an occupation as physically and mentally demanding as her prior occupation as District Director for Cricket.

**IV.  Ms. Curlis's Cognitive Limitations**

104. In order to manage her pain, Ms. Curlis takes a medication protocol of very strong medications in order to relieve her pain. Before 2014, Ms. Curlis was taking Gabapentin, Oxycodone, Fentanyl, and Soma, a combination which helped her physically function to a small degree.

105. Recently, Medicare has ceased covering Oxycontin and Fentanyl, the two most effective pain medicines she was taking.

106. As a result, Ms. Curlis has been taking MS Contin (Morphine Sulfate) and Oxycodone to try to keep the pain at bay as much as possible, although with limited success.

107. Each of these medications has strong physical and cognitive side effects that inhibit Ms. Curlis's cognitive function.

108. For example, Ms. Curlis's medication has profoundly impacted her memory and her ability to think clearly.

109. As Ms. Curlis's son, Nathan Berns, notes in a declaration he submitted to CIGNA, Ms. Curlis is "in a daze most of the time. She will lose her train of thought when we are talking and she won't be able to remember conversations we just had a few minutes before."

14

110.     As Mr. Berns's declaration also describes, Ms. Curlis's cognitive impairment interferes with even her limited daily activities.  Ms. Curlis has forgotten her key and locked herself out of the house, forgotten when she last took her medicine, and even forgotten to eat.

111.     The narcotic pain medications also interrupt Ms. Curlis's normal sleep cycle.

112.     On a good night, she is able to rest for two or three hours, but then wakes up in pain.  She tries to nap as much as she can during the day, but is fatigued all the time, both because she cannot sleep and because of the direct effects of her medication.

113.     Moreover, for approximately the last two and half years, Ms. Curlis has been suffering from frequent, but unpredictable episodes of serotonin syndrome, a side effect of narcotic pain medication caused by excess levels of serotonin building up in a patient's body.

114.     Gabapentin is an anti-seizure medication that is sometimes prescribed to treat painful nerve conditions, like the tingling, burning and numbness that radiates bilaterally from Ms. Curlis's lumbar spine down to her feet.

115.     Unfortunately, although this medication is necessary to treat Ms. Curlis's symptoms, it causes side effects that prevent her from functioning normally, including drowsiness, dizziness, and loss of coordination.

116.     Soma is a muscle relaxant that works to relieve muscle tension and pain by reducing activity and transmission of signals in the nervous system.

117.     The drowsiness, fatigue and dizziness Ms. Curlis experiences from her other medications is only compounded by this medication.

118.     Because of its impact on the nervous system, it also causes muscle tremors, which is troubling to experience and significantly impairs Ms. Curlis's motor skills and coordination.

119.     Although this medication protocol helps Ms. Curlis cope with her pain symptoms to some degree, she still experiences chronic breakthrough pain that never subsides.

## V.     Ms. Curlis's Social Security Disability Claim

120.    After Ms. Curlis lost her capacity to work in 2009, she filed a claim for benefits with the Social Security Administration ("SSA").

121.    The SSA promptly approved Ms. Curlis's claim for benefits.

122.    The SSA determined that Ms. Curlis is disabled from working in any occupation, including sedentary occupations, in the national economy.

123.    The SSA noted Ms. Curlis underwent spinal surgery on February 26, 2003, but experienced a "popping" in September of 2009, and now suffers from severe pain.

124.    The SSA described Ms. Curlis as having significant limitations in performing activities of daily living, pointing to her difficulty caring for herself, including very basic tasks like getting dressed, and her need to use a cane to ambulate.

125.    The SSA also reviewed imaging and nerve conduction studies of Ms. Curlis's spine and noted that these studies showed significant facet arthropathy and nerve damage below the L4-L5 level of her lumbar spine, and bilateral sciatic neuropathy.

126.    The SSA found it significant that Ms. Curlis had seen several treating physicians, both general practice and orthopedic surgeons, who all concluded that she is severely disabled from working.

127.    The SSA agreed with Ms. Curlis's treating physicians that she has suffered from a failed artificial disc replacement.

128.    In awarding Ms. Curlis benefits, the SSA found that Ms. Curlis's subjective reports of pain correlated with the totality of objective medical evidence, including the multitude of imaging studies and the opinions of multiple treating physicians who have all concluded that she is disabled.

129.    Additionally, the SSA's Residual Functional Capacity ("RFC") report demonstrates the severity of Ms. Curlis's physical limitations.

130.    The RFC shows that Ms. Curlis is not able to lift more than 10 pounds, has limited ability to sit and stand, can never climb ladders and can only occasionally stoop, kneel, crouch or balance.

131.    The SSA further found Ms. Curlis to be fully credible, and found that her subjective reports about her condition correlate with the totality of evidence.

132.    The SSA requires that an individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment" that is of "such severity that [Ms. Curlis] . . . cannot, considering [her] age, education, and work experience, ***engage in any other kind of substantial gainful work which exists in the national economy***, regardless of whether such work exists in the immediate area in which [she] lives." 42 U.S.C. § 423(d)(1)(A), (2)(A) (emphasis added).

133.    Thus, the SSA determined that Ms. Curlis is essentially incapable of engaging in any form of employment, regardless of salary.

134.    In February 2014, the SSA sent her a form requesting that she provide an updated list of her treating providers and answer questions regarding her condition.

135.    She did so, and provided a supplemental narrative regarding her care.

136.    The SSA received the form and has continued to pay Ms. Curlis's claim without interruption.

137.    Since CIGNA refuses to pay the benefits to which Ms. Curlis is entitled under Cricket's short-term and long-term disability plans, Ms. Curlis is entirely dependent on the $2,130.00 per month she receives in Social Security Disability Benefits.  This is not enough to support her, and she has rapidly depleted her savings while she waits for CIGNA to reverse its improper denial of her claim for benefits.

/ / /

/ / /

/ / /

/ / /

17

**VI.**    **Ms. Curlis's CIGNA Claim**

138.    Ms. Curlis's CIGNA Policy defines "Disability/Disabled" as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
> 1.    unable to perform the material duties of his or her Regular Occupation; and
> 2.    unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
> 1.    unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
> 2.    unable to earn 80% or more of his or her Indexed Earnings.

139.    Courts have further implied a requirement in disability insurance policies to require that a claimant is disabled when she is not able to perform an occupation with "reasonable continuity" in the "usual and customary manner."[1]

140.    Now that Ms. Curlis has been entitled to disability benefits for 24 months, in order for Ms. Curlis's claim to be denied, she would have to be able to work in an occupation for which she is reasonably fitted by education, training or experience, with reasonable continuity and in the usual and customary manner, that would pay her at least $102,877.80 per year (80% of her approximate pre-disability salary).

141.    When Ms. Curlis initially applied for short-term disability benefits with CIGNA, CIGNA denied her claim.

142.    On December 3, 2010, after exhausting the administrative appeal of her short-term disability claim, Ms. Curlis filed a claim for long-term disability benefits.

143.    CIGNA responded to Ms. Curlis's long-term disability claim on December 30, 2010, asking Ms. Curlis to explain her condition and why she is unable to work in her own or any occupation.

/ / /

---

[1] *See, e.g., Bravo v. U.S. Life Ins. Co.*, 701 F. Supp. 2d 1145, 1155 (E.D. Cal. 2010).

18

144.   Without waiting for a response, however, CIGNA denied that claim on January 11, 2011, alleging that she provided insufficient evidence of limitations that would preclude her from returning to work.

145.   Ms. Curlis appealed CIGNA's decision.

146.   In September 2011, based on the overwhelming evidence Ms. Curlis submitted in support of her first appeal, CIGNA reversed its denial of her claim for benefits, paid back benefits from September 13, 2009 forward and continuously paid Ms. Curlis's benefits for the next two years.

## VII.   CIGNA Terminates Ms. Curlis's Claim

147.   Since CIGNA approved Ms. Curlis's claim in September 2011, her condition has not improved.  In fact, her condition has deteriorated further.

148.   Nevertheless, on December 11, 2013, CIGNA again terminated Ms. Curlis's long-term disability benefits.

149.   CIGNA terminated Ms. Curlis's claim based primarily on surveillance footage obtained over a three-day period in October 2013 and an "Independent Medical Exam" ("IME") performed by Dr. Scott Krasner.

150.   Dr. Krasner concluded, and CIGNA agreed, that Ms. Curlis was able to work 8 hours a day.

151.   Dr. Krasner further concluded, and CIGNA agreed, that in a single work day, Ms. Curlis could:

a.   lift 20 pounds for up to 2.5 hours;

b.   carry 20 pounds for up to 2.5 hours;

c.   push 40 pounds for up to 2.5 hours;

d.   pull 40 pounds for up to 2.5 hours;

e.   climb stairs for up to 2.5 hours;

f.   stand for up to 5.5 hours;

g.   walk for up to 5.5 hours;

h.      sit for up to 8 hours;

i.      reach at all levels for up to 8 hours;

j.      use bi-lateral find manipulation, simple grasp, and bi-lateral firm grasp for up to 8 hours;

k.      lift 10 pounds for up to 8 hours;

l.      carry 10 pounds for up to 8 hours;

m.      see and hear for up to 8 hours; and

n.      use her lower extremities to operate foot controls for up to 8 hours.

152.    Based on the functionality determined by Dr. Krasner, CIGNA's "Vocational Rehabilitation Specialist" performed a Transferable Skill Analysis.

153.    CIGNA's "Vocational Rehabilitation Specialist" determined that Ms. Curlis could work in two managerial occupations, both of which CIGNA claims are suited to her education, work history, gained abilities, and the wage requirements set forth in the Policy of $102,877.80 per year.

## VIII.   Ms. Curlis Appealed CIGNA's Decision on the Basis That CIGNA Arbitrarily and Capriciously Terminated Her Benefits

154.    Ms. Curlis submitted her appeal on June 27, 2014.

155.    In her appeal, Ms. Curlis explained that CIGNA's decision to terminate her benefits was arbitrary and capricious.

156.    In reaching its decision that Ms. Curlis is capable of earning more than $100,000 per year, CIGNA relied on incomplete and unreliable sources of information.

157.    Among other things, CIGNA's decision eschewed the negative cognitive side effects of Ms. Curlis's pain medications and ignored her uncontrollable serotonin episodes.

158.    Instead, CIGNA focused upon a few hours surveillance of Ms. Curlis over a three day period, Dr. Krasner's biased and untenable IME and a flawed Transferable Skills Analysis.

/ / /

/ / /

20

*The Surveillance Video*

159.    The surveillance video upon which CIGNA based its decision to terminate Ms. Curlis's claim was obtained in October 2013.

160.    The October surveillance video of Ms. Curlis does not indicate that Ms. Curlis can work full time in any occupation.

161.    The surveillance video shows Ms. Curlis doing five things, all of which took place within a short distance of her house, and none of which involved outings of more than an hour or two at a time (with very little footage of any of her supposed activities during the outings).

162.    These outings consisted of: (1) going to Petco to adopt a small homeless dog and briefly returning to purchase supplies needed to care for the dog (approximately 1 hour and 45 minutes); (2) eating lunch on two occasions (approximately 1 hour and 40 minutes); (3) going to the doctor (approximately 55 minutes); (4) having coffee with her son (approximately 55 minutes); and (5) picking up groceries (approximately 30 minutes).

163.    None of the foregoing "activities" is in any way inconsistent with Ms. Curlis's medical records or her previously reported abilities.

164.    Throughout the surveillance video, she uses something for support, whether her cane, a shopping cart or another persons' arm.

165.    In the video, Ms. Curlis drives very short distances, sits for less than an hour at a time, and ambulates slowly with care to avoid an escalation in her pain.

166.    In fact, this is noted in the surveillance report, which states that Ms. Curlis performed her activities "in a slow, deliberate manner and utilized the support of a cane."

167.    The surveillance report also provides that, unless otherwise noted, "the claimant appeared to perform all activities while slightly stooped and utilized the support of a cane."

168.    Thus, the surveillance footage actually supports Ms. Curlis's disability claim.

169.   Even an unbiased observer unfamiliar with Ms. Curlis's medical history would recognize, after viewing the footage, that Ms. Curlis has difficulty walking.

170.   Although Ms. Curlis is able to ambulate with the help of her cane, her movement is clearly slow and methodical, and she clearly has difficulty performing tasks that a healthy individual could perform with ease.

171.   Further, the silent footage of Ms. Curlis produced by CIGNA's investigation cannot offer any insights into Ms. Curlis's mental state or the negative side effects of Ms. Curlis's medication.

172.   Moreover, the surveillance video does not show the condition Ms. Curlis was in when she returned home.

173.   Even though the physical demand of the observed outings was minimal, her symptoms dramatically worsened for some time after the outings.

174.   Additionally, the activity that is shown must be considered in light of the entirety of the time Ms. Curlis was under surveillance.

175.   Ms. Curlis was under surveillance for a total of 32.5 hours (or 1,950 minutes).

176.   At most, the surveillance video shows footage of Ms. Curlis being nominally "active" for twenty-four minutes.

177.   Therefore CIGNA has footage of Ms. Curlis actually engaged in some minimal physical activity for 1.2% of the time she was under surveillance.

178.   In fact, CIGNA's previous attempt to conduct surveillance on Ms. Curlis in May 2013 showed no activity whatsoever.

179.   This is consistent with the information Ms. Curlis has provided to CIGNA regarding her pain and her frequent serotonin episodes.  These episodes leave Ms. Curlis incapacitated for several hours at a time and usually last from the early hours of the morning until one or two o'clock in the afternoon.

180.    As a matter of common sense, it is impossible to assess an individual's ability to perform eight hours a day, over a five day workweek, based solely upon a few hours of video footage.

181.    Although Ms. Curlis may occasionally feel well enough to have a meal outside her home with her family or friends, that does not mean she has the physical or mental ability to work full time in any occupation, let alone one in which she can make more than $100,000 per year.

182.    At most, the footage demonstrates that Ms. Curlis can occasionally function physically at a very limited capacity for a few hours.

183.    Further, the footage is consistent with prior surveillance conducted in December 2011, after which CIGNA continued to consider Ms. Curlis totally disabled under the Policy.

184.    According to CIGNA, the December 2011 footage showed Ms. Curlis walking, entering and exiting the passenger seat of her vehicle, pushing a shopping cart, shopping at various stores and walking through a mall.

185.    According to the claim file, "The agent noted that the claimant walked with the assistance of a cane throughout the investigation.  CX [claimant] is active, however always uses the assistance of a cane, and usually leaning on another person for support through the duration of the video."

186.    This surveillance did not change CIGNA's determination that Ms. Curlis was totally disabled.

187.    In fact, following the December 2011 surveillance, CIGNA determined that Ms. Curlis has less than sedentary job functionality.

188.    Following the December 2011 surveillance, CIGNA's claim manager and team leader both agreed that Ms. Curlis's "condition is unlikely to change."

189.    CIGNA's claim manager and team leader also both agreed that the claim manager was "unable to impact" the status of Ms. Curlis's claim.

190.   Upon information and belief, this means that the claim manager was unable to find any way to terminate Ms. Curlis's benefits.

191.   Accordingly, following the December 2011 surveillance, CIGNA's claim manager and team leader suggested that Ms. Curlis's medical reporting requirements be reduced to annual reporting, and referred the claim to CIGNA's SAM, or "Stable and Mature" unit.

*CIGNA's IME*

192.   After obtaining the October 2013 surveillance footage, CIGNA requested that Ms. Curlis undergo an IME, performed at its expense.

193.   CIGNA subsequently informed Ms. Curlis that the IME would be conducted by Dr. Scott A. Krasner.

194.   Dr. Krasner is not a specialist in the field of medicine related to Ms. Curlis's disability.  Rather, his sub-specialty is Occupational Medicine.

195.   According to the American Board of Preventive Medicine, Occupational Medicine focuses on the health of workers, including, among other things, the ability to perform work and the prevention of occupational disability.

196.   Dr. Krasner is located in Tucson, not Phoenix, where Ms. Curlis lives.

197.   Phoenix is a major metropolitan area with thousands of doctors who are qualified to perform an IME.

198.   The Tucson metropolitan area is less than a quarter the size of Phoenix and is located more than two hours away.

199.   In letters dated November 13 and 19, 2013, Ms. Curlis offered to provide a list of alternative physicians in the Phoenix area who are qualified to perform IMEs.

200.   CIGNA declined to do so, instead paying for Dr. Krasner to make the four hour roundtrip to Phoenix to conduct the IME.

201.   After researching Dr. Krasner's background, Ms. Curlis also discovered a number of alarming facts, which she brought to CIGNA's attention.

202.   In *Ritchie v. Krasner*, 221 Ariz. 288, 211 P.3d 1272 (App. 2009), a landmark medical malpractice case, the Court upheld a jury's findings that Dr. Krasner failed to diagnose cervical spinal cord compression during an IME and, instead, determined that the claimant was medically able to perform unrestricted work.  The claimant's benefits were terminated and, since he was left uninsured as a result of Dr. Krasner's opinion, he went eight months without any follow-up treatment.  By the time the patient was accurately diagnosed, the damage he sustained was irreversible, and he ultimately died.

203.   The Court of Appeals affirmed a jury's verdict against Dr. Krasner for $1,425,000.00 for the role he played in the claimant's wrongful death.

204.   A more in-depth search of cases Dr. Krasner has been involved in suggests that Dr. Krasner has a reputation for being an unreliable and biased source, and that his professional demeanor is often challenged and chastised by courts.

205.   In spite of the provided evidence that Dr. Krasner was likely not a qualified independent medical examiner, CIGNA refused to select a different examiner.

206.   Upon information and belief, CIGNA selected and insisted on using Dr. Krasner to perform the IME of Ms. Curlis because CIGNA knew that Dr. Krasner's conclusions would support termination of Ms. Curlis's benefits.

207.   Dr. Krasner conducted the IME on November 22, 2013.

208.   Due to concerns over Dr. Krasner's bias and unprofessionalism, one of Ms. Curlis's attorneys, Karla Thompson, observed the IME and took notes.

209.   In a Declaration submitted to CIGNA, Ms. Thompson notes that Dr. Krasner was unprofessional and dismissive throughout the IME.

210.   He repeatedly interrupted Ms. Curlis as she was trying to describe her symptoms, and he did not listen to Ms. Curlis's answers.

211.   Dr. Krasner took less than one page of notes during the examination.  The notes he did make were taken on a sheet of un-lined white paper, which appeared to be scrap paper, as there was printing on the other side.

212.   In spite of AMA instructions that examinees "must be treated with dignity and respect, and provisions be made for appropriate draping, as required for modesty," Dr. Krasner did not do so.

213.   For example, Ms. Curlis told him several times that the incision from her spinal surgery was on her front, by her stomach.

214.   Despite this, during the examination, Dr. Krasner untied the back of her gown without first asking her permission, stating that he was looking for the surgical scar on her back.  In doing so, Dr. Krasner exposed Ms. Curlis's lower back and buttocks to himself, Ms. Thompson, and Dr. Krasner's medical assistant.

215.   This was embarrassing and humiliating for Ms. Curlis, and served no legitimate purpose, since there was no scar to see.  Dr. Krasner never even looked Ms. Curlis's stomach to view her scar.

216.   Towards the end of the examination, Ms. Curlis suffered a serotonin episode and was unable to move for some time.

217.   Despite Dr. Krasner's multiple statements that he was familiar with serotonin syndrome, he rushed her out of the office as soon as she was able to finish changing and sit down in her wheelchair.

218.   In fact, Dr. Krasner drove out of the parking garage before Ms. Curlis was even able to enter her car.

219.   Dr. Krasner's conduct during the IME demonstrates that he did not take his role seriously and that he went into the IME with a predetermined conclusion.

220.   Moreover, the AMA code of medical ethics instructs that IMEs require a "comprehensive review of prior medical records" and that IME reports should be framed in the context of "prior health, physical and vocational capabilities, and social functioning."

221.   Dr. Krasner also failed to diligently evaluate Ms. Curlis's medical records.

222.   When Ms. Curlis produced her medical records, which consisted of 37 documents, including 25 X-rays with 16 to 20 images per sheet, Dr. Krasner took the documents and left the room.

223.   Dr. Krasner re-entered the room approximately five minutes later and handed the 139 pages back, stating that he was finished reviewing the records.

224.   It was impossible for Dr. Krasner to have adequately reviewed 139 pages of medical documentation in approximately five minutes.

225.   Many of these medical records had not been previously provided to Dr. Krasner by CIGNA, nor did Dr. Krasner subsequently address all of them in his report.

226.   Dr. Krasner did not ask Ms. Curlis any questions regarding the cognitive side effects of her medications, conduct any mental status examination or cognitive testing, and did not appear to take any notes of her frequent lapses in memory or word recall or her loss of her train of thought.

227.   Dr. Krasner did not ask Ms. Curlis any questions about how her symptoms affected her ability to sleep or whether she experienced fatigue.

228.   In his report, Dr. Krasner did not address Ms. Curlis's cognitive limitations or her serotonin syndrome.

229.   Dr. Krasner's report largely ignored Ms. Curlis's prior medical history, and even the results of his own examination.

230.   Instead, he relied upon CIGNA's brief surveillance video as the primary evidence of Ms. Curlis's functionality and concluded that Ms. Curlis's "presentation in the exam room is not a true representation of Ms. Curlis' [sic] functional capabilities."

231.   Dr. Krasner then arbitrarily determined what Ms. Curlis's "true" capabilities are without providing any explanation for why his recommendations are inconsistent with Ms. Curlis's prior medical records and previous evaluations.

232.   Every other professional that has reviewed the surveillance video or treated Ms. Curlis for longer than a forty-five minute examination has concluded that the video is

not a true representation of Ms. Curlis's functional capabilities because it does not show Ms. Curlis's physical limitations and symptoms throughout the entire day or the many cognitive impairments caused by her medication.

233.    Thus, CIGNA should not have relied upon Dr. Krasner's IME report in the first instance, and should not have given Dr. Krasner's IME report any weight in considering Ms. Curlis's appeal.

234.    Nevertheless, CIGNA chose to elevate Dr. Krasner's opinion over that of Ms. Curlis's treatment providers.

*The Transferable Skills Analysis*

235.    Following the IME, CIGNA submitted Ms. Curlis's file to its "Rehabilitation Specialist," Randy Norris, MS, CRC, CCM, for a Transferable Skills Analysis.

236.    CIGNA asked Mr. Norris to determine Ms. Curlis's "transferable work skills" and whether "suitable occupations" exist at or above Ms. Curlis's wage requirements.

237.    Mr. Norris determined that Ms. Curlis could work in two managerial occupations, both of which CIGNA claims are suited to her education, work history, gained abilities, and the wage requirements set forth in the Policy of $102,877.80 per year.

238.    CIGNA's Transferable Skills Analysis contains several obvious errors.

239.    Accordingly, Ms. Curlis asked Robin Generaux, Ph.D. to review the Transferable Skills Analysis and explain CIGNA's errors.   Ms. Curlis submitted Dr. Generaux's report to CIGNA with her appeal.

240.    Dr. Generaux is a Certified Vocational Rehabilitation Counselor with over twenty years of professional experience in private rehabilitation, vocational and educational counseling.

241.    Dr. Generaux is a senior disability analyst with the American Board of Disability Analysts and the former President of the National Association of Rehabilitation Professionals of Nevada.

242.   Dr. Generaux's opinion should be afforded greater weight than that of Mr. Norris.

243.   Dr. Generaux holds a B.A. and M.A. in Psychology as well as Ph.D. in Human Services.

244.   According to CIGNA's claim file, Mr. Norris holds an M.S., but not a Ph.D.

245.   Upon information and belief, Mr. Norris is employed by and works exclusively for CIGNA.  As a result, Mr. Norris is inherently biased in CIGNA's favor.

246.   Dr. Generaux is an independent vocational consultant, and is therefore unbiased in her analysis.

247.   Based on her education and experience, Dr. Generaux is more qualified to opine on Ms. Curlis's ability to work in an occupation for which she is reasonably fitted by education, training or experience, with reasonable continuity and in the usual and customary manner, that would pay her at least $102,877.80 per year than Mr. Norris.

248.   In her report, Dr. Generaux notes several errors and omissions in CIGNA's Transferrable Skills Analysis.

249.   First, the Transferable Skills Analysis uses the Dictionary of Occupational Titles, rather than the more accurate O*NET to determine Ms. Curlis's occupational duties.

250.   As a result, it fails to accurately take into account the cognitive and executive functions required of the proposed positions.

251.   The Policy does not require CIGNA to use the Dictionary of Occupational Titles in evaluating Ms. Curlis's claim.

252.   As Dr. Generaux's report explains, the skills and abilities required of Ms. Curlis's former occupation, under the Department of Labor's O*NET system, include, among many other things:

a.   <u>Active Listening</u>: Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate, and not interrupting at inappropriate times.

b. <u>Reading Comprehension</u>: Understanding written sentences and paragraphs in work-related documents.

c. <u>Speaking</u>: Talking to others to convey information directly.

d. <u>Critical Thinking</u>: Using logic and reasoning to identify the strengths and weaknesses of alternative solutions, conclusions or approaches to problems.

e. <u>Coordination</u>: Adjusting actions in relation to others' actions.

f. <u>Social Perceptiveness</u>: Being aware of others' reactions and understanding why they react as they do.

g. <u>Active Learning</u>: Understanding the implications of new information for both current and future problem-solving and decision-making.

h. <u>Complex Problem Solving</u>: Identifying complex problems and reviewing related information to develop and evaluate options and implement solutions.

i. <u>Judgment and Decision Making</u>: Considering the relative costs and benefits of potential actions to choose the most appropriate one.

253.   Dr. Generaux also notes that even under the outdated Dictionary of Occupational Titles ("DOT"), Ms. Curlis's former occupation and CIGNA's proposed alternative occupations still "require the ability to analyze various data sets, formulate policies for the organization, act as a liaison between different branches of the company and customers, supervise others, and plan marketing strategy for an organization, among other things."

254.   Second, neither the Transferable Skills Analysis nor Dr. Krasner's report contain any discussion of the side effects of Ms. Curlis's narcotic pain medication regimen and their impact on her ability to work full-time in any occupation.

255.   Both the cognitive issues and serotonin episodes render her largely unemployable in any capacity, and certainly unemployable in any occupation that could command a six figure salary.

256.    From a practical perspective, Ms. Curlis's heavy doses of narcotics also likely render her unemployable, as any pre-employment drug screening would show substantial levels of opiates in her system.

257.    Finally, the Transferable Skills Analysis also fails to explain how Ms. Curlis would have the stamina to perform a full-time occupation.

258.    Neither the surveillance video nor Dr. Krasner's IME offer any support that she could consistently perform work tasks for eight hours a day, five days a week.

259.    Rather, as Dr. Generaux notes, "Ms. Curlis was videotaped performing light errands during an approximate two hour window during the middle of the day on three different days.  There is no evidence to suggest Ms. Curlis would be physically capable of sitting behind a desk for eight consecutive hours, beginning first thing in the morning and continuing through the afternoon, with only brief rest breaks."

## IX.    Evidence Supporting Ms. Curlis's Disability

260.    In addition to outlining the information set forth above, Ms. Curlis submitted copious evidence supporting her eligibility for benefits.

261.    When CIGNA denied Ms. Curlis's claim for the first time in 2011, she submitted, among other things, statement from two treating physicians, a Functional Capacity Evaluation ("FCE") performed by Richard Randall, PT, an IME performed by Michael Steingart, D.O., and statements from her son and primary caregiver, Nathan Berns, in support of her appeal.

262.    Based on the information she submitted in support of her first appeal, CIGNA overturned its decision and determined that she was entitled to total disability benefits under the Policy.

263.    Ms. Curlis underwent the FCE conducted by Richard Randall, a licensed Physical Therapist, on January 20, 2011.

264.   Mr. Randall's FCE confirmed that Ms. Curlis's disability prevents her from performing any occupation, even one that is sedentary, for any amount of time or with any reasonably continuity.

265.   During physical examination, Mr. Randall noted that Ms. Curlis is completely unable to stand fully erect, and in fact, she maintains constant 40-degree forward flexion in her spine in order to avoid aggravating her pain.

266.   Mr. Randall also observed that Ms. Curlis has no capacity to rotate her trunk or bend laterally.

267.   Mr. Randall found that Ms. Curlis is also totally unable to balance on either leg independently, and therefore, in order to walk she requires the use of a cane in her right hand and needs to use her left hand for support on nearby objects, or another person, to avoid falling over.

268.   Even when sitting, Mr. Randall explained that Ms. Curlis supported her body weight using her arms to relieve the pressure on her spine, and sat with a 45-degree bend in her upper back, with her head significantly forward-flexed.

269.   During functional capacity testing, Mr. Randall observed that Ms. Curlis demonstrated a willingness to work at her maximum capacity.  But, because of her general weakness, limitation in mobility, activation of poor body mechanics, and the risk that she would hurt herself while lifting objects, Mr. Randall was forced to limit the testing on each activity.

270.   Nonetheless, he observed that Ms. Curlis demonstrated obvious physical limitations, including a total inability to perform any standing weight-bearing exercises due to her failure to assume a fully erect posture, and limited muscular strength, endurance and stamina.

271.   Although Ms. Curlis gave a full effort to perform physical activities, Mr. Randall observed that she demonstrated appropriate pain behavior, consistent with her self-reported condition.

272.   Mr. Randall found that Ms. Curlis has no significant physical abilities, and he listed numerous significant physical deficits, including:

a.   Limited endurance for unsupported sitting and standing activities;

b.   Limited ability to perform overhead work activity;

c.   Limited usage of upper extremities for anti-gravity work away from the body (e.g., reaching forward, overhead, sideways);

d.   Limited ability to sit without spinal or upper extremity support;

e.   Limited endurance and poor body mechanics for weight capacity lifting and carrying activities;

f.   Limited ambulatory endurance and progressively slow-paced gait;

g.   Inability to perform floor activities (e.g., kneel, crouch, squat, crawl);

h.   Below average manipulative and coordination skills.

i.   Cognitive difficulties with following directions and multi-tasking;

j.   Inability to perform vertical activity (e.g., climbing stairs or ladders) secondary to lower extremity, lumbo-pelvic girdle and spinal weakness, inadequate balance, lack of endurance and lack of erect posture.

273.   Mr. Randall characterized Ms. Curlis's condition as preventing her from performing essentially any physical activity, let alone working in any full-time occupation:

Ms. Curlis would not be able to function at [even] a sedentary work category. She would have to exert up to 10 lbs. of force occasionally, and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve standing or walking for brief periods of time.  Ms. Curlis's physical restrictions and limitations, radiating irritation to the upper and lower extremities, loss of functional upper and lower quarter as well as spinal strength and endurance, occurrences of confusion and hesitancy with directions, and inability to maintain any sustained, functional work position, even on a short term basis, would preclude her from maintaining an effective sedentary work level with any level of pace and persistence.

274.   Mr. Randall felt it appropriate, given the obvious physical difficulties Ms. Curlis had with walking, to videotape Ms. Curlis's attempts to walk.

275. The video footage and photographs taken during the FCE demonstrate Ms. Curlis's visible pain from walking a short distance, and even basic activities like lifting her hands over her head or sitting in a chair.

276. On February 10, 2011, Ms. Curlis also underwent an IME with Dr. Michael Steingart, a Phoenix orthopedic surgeon, to evaluate her condition and determine whether there were any other treatment options available to her.

277. Dr. Steingart identified a number of objective medical findings to be remarkable, including the MRIs of Ms. Curlis's lumbar spine from 2009 and 2010, the CT scans from 2009 and 2010, an EMG from 2010, the ineffective series of epidural and facet injections, the protocol of medications with significant side effects, the range of motion testing performed on Ms. Curlis by prior treatment providers, as well as the range of motion testing he performed, his own physical examination, and Mr. Randall's FCE.

278. On physical examination, Dr. Steingart found Ms. Curlis to be in marked distress due to her pain, and he observed muscle tremors and sweating due to physical exertion.

279. He found that Ms. Curlis ambulated with a cane to avoid falling, and her gait was side-bent to the right, with a significantly forward-flexed posture.

280. He noted that Ms. Curlis sat very stiffly as she was being examined, and described "visible signs of anguish that are appropriate behavioral responses to the level of pain she describes."

281. Dr. Steingart also noted that Ms. Curlis's "[r]ange of motion is severely limited, and far outside a normal, healthy range."

282. Dr. Steingart observed marked percussive tenderness at the lumbosacral junction of Ms. Curlis's spine, along with pain and tenderness trigger points in the middle-thoracic region.

283. His physical examination revealed limited strength with significant muscle atrophy in both legs.

284.   Dr. Steingart found Ms. Curlis's subjective symptoms of chronic pain, inability to extend her lumbar spine, lack of mobility, and decreased cognition due to medication and pain, to be consistent with the objective evidence, his physical examination of Ms. Curlis, and her medication protocol.

285.   Dr. Steingart concluded that Ms. Curlis's symptoms are consistent with late effects of artificial disc replacement failure, which he noted is well-documented in orthopedic literature for causing facet joint failure.

286.   Dr. Steingart opined that this failed disc replacement is the source of Ms. Curlis's severe pain and decreased range of motion, indicating that "Ms. Curlis's facet joints are, in all medical probability, damaged beyond repair."

287.   Dr. Steingart further opined, to a reasonable degree of medical probability, that Ms. Curlis is disabled from performing any occupation with any reasonable continuity, even with accommodations, and that she has been continually disabled since she filed her claim in 2009.

288.   Dr. Steingart also reviewed CIGNA's 2011 denial letter.

289.   After personally examining Ms. Curlis and reviewing the records that were available to CIGNA when it denied Ms. Curlis's claim, Dr. Steingart also reviewed CIGNA's rationale for denying her claim.

290.   In so doing, Dr. Steingart discovered that CIGNA did not even mention the vast majority of Ms. Curlis's records, which support her claim.  Dr. Steingart had harsh words for CIGNA's behavior, expressing that he was "frankly shocked by the decision [to deny Ms. Curlis's claim] because Ms. Curlis is blatantly disabled."

291.   In addition to Mr. Randall's and Dr. Steingart's evaluations, Ms. Curlis also obtained statements from two of her treating physicians, Dr. Nasser and Dr. Landsman, regarding the severity of her symptoms, the extent of her limitations, and the lack of viable treatment options available to her.

292.   Dr. Nasser stated his belief that Ms. Curlis was accurately reporting her symptoms and was not in any way malingering.

293.   He then noted the severity of Ms. Curlis's symptoms and their impact on her ability to function, as well as the lack of treatment options available to her.  He noted:

> [I]t may never be possible for Ms. Curlis to obtain any significant improvement from the lower back pain, weakness, and numbness, especially since surgery is not a viable option.  The pain is severe and debilitating and, at times, Ms. Curlis's pain is so severe that she reports becoming nauseous and blacking out.
>
> *     *     *
>
> The pain and the medications Ms. Curlis takes for the pain have a significant impact on her ability to function, and cause fatigue, lack of cognitive ability, and an inability to concentrate, among other things.  Due to this, I would advise Ms. Curlis to limit, if not eliminate the amount of driving she does.  Ms. Curlis's pain is also exacerbated by any prolonged period of remaining in the same position, and she is unable to stand, sit, or walk for any reasonable period of time.  Ms. Curlis must use a cane or walker to ambulate, and is unable to lift or carry anything but a negligible amount of weight.  She is unable or severely limited in her ability to twist, bend, stoop, kneel, or do anything else that and individual would typically be expected to do as part of his or her occupation.

294.   Dr. Landsman similarly opined that Ms. Curlis was suffering from chronic and severe pain and that she "has been unable to work from the initial visit because of her chronic pain."

295.   Dr. Landsman concluded: "I think that her inability to work is likely permanent.  The patient's pain is supported objectively by physical examinations, MRI findings, CT scan findings as well as x-ray findings."

296.   After CIGNA terminated her claim in 2013, Ms. Curlis submitted additional evidence in support of her eligibility for benefits, including, among other things, a statement from Dr. Vosler, a second FCE, a second IME, a vocational analysis, and another statement from her son and caregiver Mr. Berns.

297.   To demonstrate the history of her symptoms and the overall deterioration in her health, Ms. Curlis asked her pain management doctor, Kent Vosler, to prepare a statement regarding her condition.

298.   Dr. Vosler's June 17, 2014 statement explained that, because Ms. Curlis is not a candidate for surgery, "her treatment is palliative, focused on managing her symptoms through medication."

299.   Dr. Vosler's explained that, due to changes in Medicare coverage, Ms. Curlis was forced to her change medication over the past year.

300.   As a result, Dr. Vosler shifted her medication from Fentanyl and Oxycontin, which offered some occasional relief from the pain, to Morphine (MS Contin) and Oxycodone, which have been less effective, even in increased doses.

301.   Dr. Vosler's report also explained several unavoidable negative side effects of narcotics taken at Ms. Curlis's dosage levels.

302.   For example, he noted that her medications leave her groggy, muddle her thinking, cause fatigue, and interfere with her digestive system and GI tract, causing chronic and severe constipation.

303.   In addition to pain and the negative side effects of the medication, Dr. Vosler confirmed that Ms. Curlis suffers weakness and intermittent numbness from the waist down, which causes her to fall on a regular basis.

304.   When Ms. Curlis falls and fractures a bone, she goes to Dr. Vosler's practice for treatment.

305.   Therefore, in addition to seeing her monthly for pain medication management, he is well aware of her overall medical situation and is in the best position to gauge her functionality.

306.   Dr. Vosler's conclusions about Ms. Curlis's ability to return to work are emphatic.  He stated:

> On every occasion on which I have examined her, [Ms. Curlis] has been in visible pain, has had very limited range of motion, and has needed support to ambulate.  I have **never** suspected the patient of exaggerating her symptoms at all.  There is **no** way the patient could work in any capacity given her limitations, and I am incredulous that her insurance company could determine otherwise.

I can say with absolute confidence that there is no way [Ms. Curlis] can return to, nor should she attempt to return to any kind of work. The side effects of her pain medications alone would render her unable to perform in any job, not to mention her inability to sit or stand for extended periods of time, her balance problems, the intermittent numbness in her legs, the constant fatigue from being unable to sleep due to the pain and medications and her digestive issues. If she tried to return to work, I am very concerned that due to her balance problems and cognitive issues, combined with the fragility of her lumbar spine, she could end up hurting herself even worse.

307. In its January 2013 denial letter, CIGNA recommended that Ms. Curlis undergo a new FCE to determine her physical abilities.

308. On May 11, 2014, at her own expense, Ms. Curlis participated in an FCE performed by Sandy Goldstein, PT, CDMS.

309. Mr. Goldstein conducted extensive testing of Ms. Curlis's functionality, with built-in reliability measures to ensure she was exerting maximum effort.

310. Mr. Goldstein found that Ms. Curlis's physical capabilities are severely limited.

311. Mr. Goldstein's report provided that Ms. Curlis cannot lift or carry more than five pounds in one hand, primarily due to impaired balance and dependence on external support, and that she cannot lift any materials at all above chest level.

312. Additionally, he found that Ms. Curlis cannot push, pull or lift with her legs at all, although she can operate foot controls occasionally.

313. He also determined that Ms. Curlis cannot engage in forward bending or stooping, and that she generally cannot turn her head greater than 45 degrees from side to side.

314. Mr. Goldstein found that due to the discomfort caused by Ms. Curlis's back pain, she also is "unable to tolerate sitting or standing to perform work tasks for any appreciable amount of time."

315. The FCE also revealed several other important findings, including, but not limited to:

a. Severe thumb limitations;

b.    Mobility impairments affecting ability to bend forward at waist;

c.    Inability to heel and toe walk;

d.    Problems with single leg balance;

e.    Inability to climb up ladders or steps;

f.    Inability to kneel or squat;

g.    Inability to actively move lumbar spine;

h.    Decreased grip and pinch strength;

i.    Low aptitude for keyboard speed, finger dexterity, and manual dexterity;

j.    Very low aptitude for balance and agility;

k.    Very low walking velocity; and

l.    Very low tolerance for standing, sitting, walking or climbing.

316.    Mr. Goldstein specifically compared the FCE results to the physical demands of "Sedentary" job match title and the DOT positions of "Manager, Department" and "Manager, Industrial Organization," the positions that CIGNA claims Ms. Curlis is qualified to perform.

317.    Mr. Goldstein concluded that Ms. Curlis was "Disabled Totally from employment or work at home" and that "[b]ased on a reasonable degree of occupational health or ergonomic probability," Ms. Curlis "would not be able to perform any work including SEDENTARY work on a regular, full time or even part-time basis."

318.    Mr. Goldstein was particularly concerned because Ms. Curlis's "low aptitude for walk velocity is suggestive of significant falls risk and would create a safety issue in the workplace."

319.    Additionally, Mr. Goldstein specifically stated that his review of the October surveillance footage "did not reveal any information that would make me question the validity or reliability of the results of the FCE" and that "Ms. Curlis provided a full effort throughout the FCE and did not demonstrate any self-limiting or suspicious behaviors."

320.   On May 14, 2014, Ms. Curlis also participated in an IME conducted by Dr. Michael A. Steingart.

321.   Because Dr. Steingart previously performed the IME of Ms. Curlis in 2011, he was in the best position to evaluate how Ms. Curlis' restrictions and limitations had changed over time.

322.   Dr. Steingart's report began by noting that Ms. Curlis constantly deals with a 9/10 pain level, and must wake up early in morning to take medications in order to sustain her during the day.

323.   Dr. Steingart also elaborated on several negative side effects of her current medications.

324.   For example, Ms. Curlis's medications cause forgetfulness and interfere with her ability to concentrate, resulting in defects in judgment and inability to control emotions, and making it impossible for her to perform even the simplest tasks, such as effectively sticking to her medication schedule.

325.   Additionally, Dr. Steingart recognized that Ms. Curlis's high doses of narcotics cause her to suffer from serotonin syndrome.

326.   He noted that when she has a serotonin episode, she suffers difficulty breathing, heavy sweating, trembling and severe chest pain, and has even vomited and passed out on some occasions, and explained that, unfortunately, the negative side effects of Ms. Curlis's medications will only increase because her dosages will inevitably increase in order to counteract her chronic pain as the narcotics become less effective over time.

327.   Dr. Steingart was also critical of Dr. Krasner's IME, and characterized it as "one-dimensional" as opposed to "fair and balanced" because Dr. Krasner failed to address several important issues, such as Ms. Curlis's serotonin episodes and GI issues.

328.   Dr. Steingart reviewed the October 2013 surveillance video and concluded that the video did not provide enough information to conclude functionality on a regular, consistent basis because (1) although the purpose of medication is to improve Ms. Curlis's

capacity to move around, it is not consistently effective; and (2) the video does not show the cognitive effects of her medication.

329.   Moreover, Dr. Steingart noted that the video does not show how Ms. Curlis's attempts in increased physical activity inevitably lead to increases in symptoms for several days thereafter.

330.   In sum, Dr. Steingart concluded that Ms. Curlis's lack of mobility, lack of physical stamina, cognitive impairments, and serotonin episodes preclude her from performing effectively and reliably in any occupation.

331.   Based on the actual limitations identified by Mr. Goldstein and Dr. Steingart, Ms. Curlis also sought a vocational evaluation from Dr. Robin Generaux.

332.   In addition to describing the failings of CIGNA's Transferable Skills Analysis as outlined above, Dr. Generaux the significance of the SSA's initial determination, which was made when Ms. Curlis was only 48 and therefore did not qualify for any consideration because of her age.

333.   The SSA found that, even at her younger age, Ms. Curlis was not able to work in any gainful employment in the national economy.

334.   Dr. Generaux concurred with SSA, and found that, based on all of the medical evidence available to her, as well as CIGNA's IME, Transferable Skills Analysis and surveillance video, that "from a vocational standpoint, Ms. Curlis is precluded from all work related activity and meets the definition [of disability] set forth in her policy."

335.   Thus, as Ms. Curlis explained in her appeal, the overwhelming medical and vocational evidence demonstrates that she remains permanently and totally disabled, and that she cannot work in any occupation.

336.   Though she submitted her appeal in June, by the end of October 2014, CIGNA had yet to advise Ms. Curlis of its decision regarding her appeal.

337.   Given the substantial time that had passed since submitting her appeal, on October 23, 2014, Ms. Curlis submitted updated medical records from Dr. Vosler.

338.   In the interest of ensuring that CIGNA had a complete picture of Ms. Curlis's current condition, Ms. Curlis also advised that she would make herself available for a telephone call with CIGNA's claims personnel.

339.   CIGNA did not avail itself of the opportunity to speak with Ms. Curlis, or even respond to her offer.

340.   By November 2014, Ms. Curlis had been experiencing increased pain after eating, causing her to lose her appetite and avoid eating altogether.   As a result, she experienced significant weight loss.

341.   On November 3, 2014, Ms. Curlis provided CIGNA with treatment notes of Dr. Gerald Asin, a physician she consulted regarding her weight loss and pain after eating.

342.   In his note, Dr. Asin confirmed that Ms. Curlis is chronically ill and undernourished, having lost close to 20 pounds from April to July.

**X.   CIGNA Upheld its Arbitrary and Capricious Decision on Appeal**

343.   CIGNA did not advise Ms. Curlis of its decision regarding her appeal until January 30, 2015.

344.   In a January 30, 2015 letter, CIGNA upheld its prior decision to terminate Ms. Curlis's benefits.

345.   CIGNA's decision not to reinstate Ms. Curlis's benefits was primarily based on the report of its medical consultant, Mark Hinrichs, and his statements regarding the surveillance footage taken in October 2013.

346.   CIGNA claimed that there is no medical evidence that would support Ms. Curlis would be medically harmed by increased activity.

347.   Despite the findings of Dr. Steingart and the well-documented side effects of Ms. Curlis's medication, CIGNA determined that the available medical evidence did not support any functional limitations or cognitive issues resulting from medication side effects.

/ / /

/ / /

1    **XI.    Standard of Review**

2        348.    Because this is an action challenging a disability insurance benefit

3    determination under ERISA, the default standard of review is *de novo*.[2]

4        349.    The standard of review in this case does not shift to abuse of discretion,

5    because the terms of the Policy do not specifically and unambiguously grant discretion to the

6    plan administrator to determine benefits.[3]

7        350.    The Policy merely states that "The Plan Administrator has appointed the

8    Insurance Company as the named fiduciary for deciding claims for benefits under the Plan,

9    and for deciding any appeals of denied claims."

10       351.    This language does not unambiguously confer any discretionary authority on

11   CIGNA to interpret and construe the terms of the Policy.

12       352.    Moreover, CIGNA lacks any authority or power to interpret the terms of the

13   Policy or resolve any ambiguities, inconsistencies and omissions, or otherwise act in any

14   discretionary capacity.

15       353.    Although the Summary Plan Description ("Plan"), attached hereto as **Exhibit**

16   **A**, states "[t]he Insurance Company shall have the authority, in its discretion, to interpret the

17   terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan,

18   and to make any related findings of fact," this is insufficient to confer discretion on CIGNA,

19   as the actual language of the policy is silent.[4]

20       354.    For the reasons detailed herein, CIGNA's claim decision, and its determination

21   to uphold that decision on appeal, was clearly incorrect and should be overturned by the

22   Court.

23   / / /

24   / / /

25   _____

26   [2] *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

27   [3] *Ingram v. Martin Marietta Long Term Disability Plan*, 244 F.3d 1109, 1113 (9th Cir. 2001).

28   [4] *Reinertsen v. Paul Revere Life Ins. Co.*, 127 F. Supp.2d 1021, 1030 (N.D. Ill. 2001).

## XII.   CIGNA'S Continued Denial of Ms. Curlis's Claim Is Also an Abuse of Discretion

355.   Even under an abuse of discretion standard, CIGNA's decision should be overturned, as its conflict of interest in Ms. Curlis's claim affected its determination.

356.   CIGNA abused its discretion in determining to discontinue Ms. Curlis's long-term disability benefits by, among other things, administering her claim with a pre-determined outcome, failing to develop necessary facts, failing to engage in a meaningful dialogue with Ms. Curlis, making clearly erroneous factual determinations, failing to conduct an analysis of Ms. Curlis's co-morbid conditions and evaluate her as a whole person, and failing to properly credit a favorable SSA determination.

*CIGNA's Conflict of Interest and Pre-determined Outcome for Ms. Curlis's Claim*

357.   CIGNA has a structural conflict of interest, as CIGNA is responsible both for determining whether Ms. Curlis is entitled to benefits, and for paying those benefits.

358.   CIGNA's conflict of interest affected its decision to arbitrarily and capriciously discontinue Ms. Curlis's long-term disability benefits by impacting its ability to act impartially.

359.   Consistent with its conflict of interest, CIGNA's claim file demonstrates that its decision to terminate Ms. Curlis's benefits was pre-determined.

360.   Upon information and belief, CIGNA had been searching for ways to terminate Ms. Curlis's benefits for quite some time.

361.   Approximately a year and a half after Ms. Curlis's claim was referred to CIGNA's "Stable and Mature" unit, CIGNA inexplicably started managing it more aggressively in mid-2013.

362.   In May 2013, CIGNA conducted a round of surveillance on Ms. Curlis.

363.   The May 2013 surveillance did not provide any results that would allow CIGNA to terminate Ms. Curlis's benefits.

364.   In August 2013, CIGNA's claims consultant, Janella Deer, apparently had a "walk up" consultation with a CIGNA vocational consultant.

44

365.   Though there is no formal record of what was discussed during that "walk up" meeting, the vocational consultation apparently concluded that "no occ[upations] would be found [that Ms. Curlis could perform] with the functionality provided" by the most recent claim form Ms. Curlis's treating physician, Dr. Vosler, submitted.

366.   Following the unsuccessful "walk up" meeting, on September 5, 2013, CIGNA conducted a meeting to discuss staffing on Ms. Curlis's claim.

367.   CIGNA decided to remove the current Nurse Case Manager from Ms. Curlis's claim, as he or she was "unable to impact" Ms. Curlis's claim.

368.   Upon information and belief, CIGNA removed the current Nurse Case Manager from Ms. Curlis's claim because that individual was not able to provide an opinion supporting termination of Ms. Curlis's benefits.

369.   Shortly thereafter, Ms. Deer ordered another round of surveillance on Ms. Curlis, which was performed in October 2013.

370.   Only after the surveillance footage of Ms. Curlis was acquired did CIGNA order Dr. Krasner's IME.

371.   The claim file indicates that CIGNA's rationale for ordering an Independent Medical Examination was "Conflicting Medical Information."

372.   However, there was no conflicting medical information in Ms. Curlis's file, as all of Ms. Curlis's medical providers and medical records supported (and continue to support) her total disability.

373.   Rather, the timing of Dr. Krasner's IME indicates that the exam was simply an effort to attach some form of medical significance to the surveillance video.

374.   On December 4, 2013, after Ms. Curlis submitted her appeal, CIGNA's Senior Claim Manager, Leon Farmer, concluded ***not*** that Ms. Curlis had adequate functionality to preclude benefits, but that "***[f]unctionality is unclear***."

375.   Rather than gathering additional information to obtain a clear determination of Ms. Curlis's functionality, however, CIGNA simply denied her appeal on December 12,

1   2013, without any further investigation.

2       376.   CIGNA's decision to deny Ms. Curlis's claim and her appeal, despite her

3   documented condition and functionality which CIGNA admitted was "unclear" at best, is

4   consistent with its voluminous history of biased claims determinations.

5       377.   In fact, Market Conduct Examinations from several states reveal that CIGNA

6   has committed several infractions, including failing to select appropriate medical examiners

7   on multiple occasions.

8       378.   Because of its track record of biased claims administration, CIGNA is now a

9   party to a Regulatory Settlement Agreement that requires it to select individuals to conduct

10  IMEs "solely on the basis of objective, professional criteria."

11                          *Failure to Develop Necessary Facts*

12      379.   CIGNA failed to sufficiently develop facts necessary to make a determination

13  of Ms. Curlis's claim.

14      380.   Each and every treatment provider who has examined Ms. Curlis has noted that

15  Ms. Curlis suffers from severe and constant back pain that totally prevents her from

16  engaging in any occupation, as well as many activities of daily living.

17      381.   However, in reviewing Ms. Curlis's condition, CIGNA did not consider Ms.

18  Curlis's prior medical history, instead basing its determination primarily upon limited

19  surveillance footage and a single medical examination conducted by Dr. Krasner.

20      382.   CIGNA disregarded the findings of Mr. Randall's FCE, which was in its

21  possession prior to terminating Ms. Curlis's benefits.

22      383.   Moreover, even though CIGNA knew a current FCE could demonstrate that

23  Ms. Curlis was eligible for benefits, CIGNA failed to obtain a current FCE before

24  terminating her claim.

25                          *Failure to Engage in a Meaningful Dialogue*

26      384.   CIGNA has also failed to engage in a meaningful dialogue with Ms. Curlis

27  regarding the reasons for its adverse decision and any additional information necessary for

28

1   her to perfect her claim for benefits.

2       385.   For instance, CIGNA's January 30, 2015 denial letter did not explain why Ms.

3   Curlis's prior medical history was not given substantial weight, despite numerous statements

4   in previous medical reports that Ms. Curlis's condition is likely permanent and only treatable

5   through palliative care.

6       386.   Additionally, CIGNA did not explain to Ms. Curlis what information she could

7   provide to show CIGNA that she is disabled.

8       387.   The denial letter did not address any of Ms. Curlis's concerns regarding Dr.

9   Krasner's IME, the Transferable Skills Analysis, or the improper reliance on the October

10  2013 surveillance footage.

11      388.   When Ms. Curlis offered to speak with CIGNA's claims representative to

12  discuss her conditions and limitations upon filing her appeal, CIGNA ignored her offer.

13                    *Clearly Erroneous Factual Determinations*

14      389.   CIGNA also made clearly erroneous factual determinations as a result of its

15  bias.

16      390.   For instance, prior to terminating Ms. Curlis's benefits, CIGNA noted multiple

17  times that the October 2013 surveillance video showed Ms. Curlis performing activities "***in a***

18  ***slow manner with assistance of a cane***."

19      391.   After Ms. Curlis brought this to CIGNA's attention on her appeal, however,

20  CIGNA began blatantly misrepresenting the contents of the surveillance video, presenting

21  the manufactured version of Ms. Curlis's activities as fact.

22      392.   In January 2015, CIGNA's medical consultant, Mark Hinrichs, stated that in

23  the surveillance video, Ms. Curlis walked "***with a normal gait and was not always reliant***

24  ***on her cane***."

25      393.   According to the claim file, Dr. Hinrichs contacted Ms. Curlis's doctor, Dr.

26  Vosler, to share this false version of events from the October 2013 surveillance video.

27      394.   According to CIGNA, based on that conversation, Dr. Vosler "was not willing

28

to sign a form offered to him in support of [Ms. Curlis's] disability."

395.   There is no evidence in either CIGNA's claim file or Dr. Vosler's records regarding whether Dr. Vosler personally reviewed the October 2013 surveillance footage.

396.   In fact, Dr. Hinrichs stated in his report that "***[t]he surveillance video was not included in the medical records***" CIGNA provided Dr. Hinrichs to review.

397.   Thus, not only did CIGNA's consultant, Dr. Hinrichs, misrepresent the surveillance footage in the claim file and to Ms. Curlis's treating doctor, he did so ***without ever having seen the video***.

398.   Further, there is no evidence in either CIGNA's claim file or Dr. Vosler's records regarding what form was offered to Dr. Vosler to sign in support of Ms. Curlis's disability.

*Failure to Analyze Co-Morbid Conditions and Evaluate Ms. Curlis as a Whole Person*

399.   CIGNA's appeal determination did not address Ms. Curlis's functional limitations as they relate to her serotonin syndrome.

400.   CIGNA's determination of Ms. Curlis's appeal did not address her GI issues, including her dramatic weight loss as reported by Dr. Asin.

401.   CIGNA also abused its discretion by failing to consider how the side effects of Ms. Curlis's medication impact her ability to work, even though Ms. Curlis presented evidence to that effect.

402.   For instance, the Transferable Skills Analysis CIGNA performed following Ms. Curlis's appeal indicated that Ms. Curlis's "skills and abilities" included "Analyzing and interpreting mathematical information in written or diagrammatic form; speaking to large groups and writing clearly and authoritatively; making decision based on personal experience and judgment as well as verifiable facts and figures; planning long range or future projects; directing work of others; working with complex financial and statistical data; dealing with individuals and groups of people with diverse interests."

403.   There is no indication in the claim file how CIGNA determined Ms. Curlis

currently possesses these skills and abilities, all of which depend on her cognitive and/or intellectual functioning.

404. In fact, the only documentation of Ms. Curlis's cognitive and/or intellectual functioning is the evidence that she submitted, which indicates that she does not currently possess the cognitive and intellectual skills and abilities CIGNA used in its Transferable Skills Analysis.

### *Failure to Properly Credit a Favorable SSA Determination*

405. CIGNA had an obligation to consider a SSA disability determination in Ms. Curlis's favor.

406. In fact, CIGNA's recent Regulatory Settlement Agreement provides that Social Security disability benefits are an "essential factor" in the claims analysis and must be given "significant weight" in claimant's favor.

407. Prior to upholding its decision on appeal Ms. Curlis's benefits, CIGNA did not make any attempt to obtain Ms. Curlis's SSA file or evaluate the SSA opinion.

408. Additionally, CIGNA did not consider the fact that the SSA has evaluated Ms. Curlis's claim further.

409. CIGNA's January 30, 2015 letter stated that CIGNA considered the fact that Ms. Curlis had been awarded Social Security Disability Insurance benefits.

410. However, CIGNA stated, "We have confirmed that there is no new information in [Ms. Curlis's] SS file since the time of her initial Social Security award. As a result, we are in receipt of more recent information than the SSA had to consider at the time of its decision."

411. CIGNA's statement that there is no new information in Ms. Curlis's Social Security Disability Insurance file since the time of her initial Social Security award is not correct, as Ms. Curlis submitted new information to SSA, at SSA's request, in February 2014.

412. There is no evidence in the claim file that CIGNA contacted the SSA to

confirm whether there was new information in Ms. Curlis's Social Security Disability Insurance file prior to upholding its decision on appeal.

## FIRST CAUSE OF ACTION

### (For Recovery of Plan Benefits, Pursuant to 29 U.S.C.A. § 1132(a)(1)(B))

413.   Ms. Curlis realleges and incorporates Paragraphs 1 through 412 as if fully set forth herein.

414.   Ms. Curlis has performed all conditions, covenants, and promises required to be performed on her part under the terms of the Policy.

415.   Ms. Curlis is entitled to benefits under the terms of the Policy.

416.   CIGNA failed to provide such benefits.

417.   Denial of benefits to Ms. Curlis constitutes a breach of the Policy.

418.   CIGNA has arbitrarily and capriciously breached its obligations under the ERISA policy by denying Ms. Curlis benefits she is entitled to under the terms of the Plan.

419.   As a direct and proximate result of the conduct of CIGNA in failing to provide coverage and pay benefits to Ms. Curlis, Ms. Curlis has been damaged in an amount equal to the amount of benefits to which Ms. Curlis would have been entitled under the terms of the Policy.

420.   As a direct and proximate result of the conduct of CIGNA in failing to provide coverage and benefits under the Policy, Ms. Curlis has suffered, and will continue to suffer in the future, damages under the Policy, plus interest and other economic and consequential damages, for a total amount to be determined at the time of trial.

421.   Ms. Curlis is entitled to benefits and prejudgment interest at the appropriate rate.

422.   Ms. Curlis therefore seeks reimbursement and compensation for any and all benefits she would have received as a result of CIGNA's failure to provide coverage in an amount presently unknown but to be set forth at the time of trial.

/ / /

## SECOND CAUSE OF ACTION

**(For an Award of Attorneys' Fees and Costs, Pursuant to 29 U.S.C.A. § 1132(g)(1))**

423.    Ms. Curlis realleges and incorporates Paragraphs 1 through 422 as if fully set forth herein.

424.    29 U.S.C.A. § 1132(g)(1) authorizes this court to award reasonable attorney's fees and costs of action to either party in an ERISA action.

425.    As a result of the actions and failings of CIGNA, Ms. Curlis has retained the services of legal counsel and has necessarily incurred attorney's fees and costs in prosecuting this action.

426.    Further, Ms. Curlis anticipates incurring additional attorney's fees and costs in pursuing this action, all in a final amount which is currently unknown.

427.    Ms. Curlis therefore requests an award of reasonable attorney's fees and costs.

WHEREFORE, Cindy requests that the Court enter judgment against Defendants as follows:

A.    For a declaration regarding CIGNA's noncompliance with minimum requirements of ERISA and other federal and state laws in connection with the denial of benefits;

B.    For a declaratory judgment concerning Cindy's rights to future benefits under the Policy;

C.    For benefits payable under the Policy to reimburse Cindy for payments that she has been entitled to receive;

D.    For future benefits that Cindy is entitled to receive under the Policy;

E.    For an award of prejudgment interest;

F.    For an award of reasonable attorneys' fees pursuant to 29 U.S.C.A. § 1132(g)(1);

G.    For costs incurred; and

H.    For such other and further relief as the Court deems appropriate.

DATED this 27th day of April, 2015.

COMITZ | BEETHE

By  /s/Edward O. Comitz
Edward O. Comitz
Patrick T. Stanley
Karla B. Thompson
6720 N. Scottsdale Road, Suite 150
Scottsdale, AZ 85253
*Attorneys for Plaintiff*